United States District Court
Southern District of Texas
**ENTERED**
September 28, 2021
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JPMORGAN CHASE SEVERANCE PAY PLAN ADMINISTRATOR, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-21-1685 |
| PATRICIA ROMO, | § § § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Patricia Romo was a financial advisor with JPMorgan Chase for 14 years. (Docket Entry No. 6, at ¶¶ 8–9; Docket Entry No. 13, at 6). In 2018, JPMorgan Chase notified Romo that it was eliminating her position. (Docket Entry No. 6, at ¶ 8). JPMorgan Chase told Romo in writing that the JPMorgan Chase U.S. Severance Pay Plan entitled her to 42 weeks of severance-eligible compensation and paid her that amount in one lump-sum payment. (*Id.* ¶ 9; Docket Entry No. 7-1, at 3). In fact, Romo was entitled to only 34 weeks of severance-eligible compensation at a different compensation rate. (Docket Entry No. 6, at ¶¶ 8–9). The JPMorgan Chase U.S. Severance Pay Plan Administrator notified Romo of the error and asked her to remit the overpayment amount of $102,660.40. Romo refused. After multiple unsuccessful efforts to collect the overpayment, the Plan Administrator, as fiduciary of the Pay Plan, filed this suit under the Employment Retirement and Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(3). Romo moved to dismiss under Rules 12(b)(1) and 12(b)(6), the Plan Administrator responded, (Docket Entries Nos. 12, 13, 20), and the court heard argument. Each argument is addressed below. Based on the motion, the response, the pleadings, the record, the arguments of counsel,

and the applicable law, the court denies the motion to dismiss under Rule 12(b)(1) and grants the motion to dismiss in part under Rule 12(b)(6), with leave to amend by October 8, 2021. The reasons are set out below.

I.     Background

Romo worked as a financial advisor in the JPMorgan Chase International Financial Services division from 2004 until 2018. (Docket Entry No. 12, at 6). In an August 2, 2018, letter, JPMorgan Chase notified Romo that it was eliminating her position effective September 15, 2018. The letter stated that Romo was entitled to severance pay "based on the terms of the JPMorgan Chase Severance Pay Plan." (Docket Entry No. 6, at ¶ 8; Docket Entry No. 7-1, at 2). The letter went on to state that Romo was "eligible for a payment equal to 42 weeks of severance-eligible compensation . . . in accordance with the terms of the Severance Plan." (Docket Entry No. 7-1, at 3). The payment would be "in one lump sum," conditioned on Romo's timely execution of a "Release Agreement." (*Id.*). That Agreement released JPMorgan Chase from legal claims "in exchange for severance pay and other severance-related benefits," which would "exceed any pay and/or benefits [Romo] would be eligible to receive if [she] d[id] not sign the Release." (*Id.*, at 3, 14).

Romo executed the release and received 42 weeks of severance-eligible compensation. (Docket Entry No. 12, at 6). Shortly after, the Plan Administrator discovered in a "routine audit" that Romo was entitled only to 34 weeks of severance-eligible compensation. As a result of the error, Romo "was overpaid in the amount of $102,660.40." (Docket Entry No. 6, at ¶¶ 9–10). The Plan Administrator "made multiple attempts to confer with [Romo] about the overpayment." (*Id.*, at ¶ 11). Despite these efforts, Romo "refused to remit the overpayment." (*Id.*, at ¶ 12).

The Plan Administrator, as a fiduciary of the JPMorgan Chase Severance Pay Plan, sued Romo under ERISA, 29 U.S.C. § 1132(a)(3), claiming that Romo was "obligated to repay the overpayment balance under ERISA . . . the terms of the Policy, and equity." (Docket Entry No. 6, at ¶ 13). The Plan Administrator sought "reimbursement . . . for the balance of the Plan benefits that were overpaid under the Policy in the amount of at least $102,660.40, plus interest," and attorneys' fees. (*Id.*, at ¶¶ 19, 20–25).

Romo moved to dismiss under Rules 12(b)(1) and 12(b)(6). In her Rule 12(b)(1) motion, Romo argued that the payment she received from JPMorgan Chase following her termination was "not a general benefit provided by JPMC's Severance Pay Plan," but instead a private "agreement between JPMC and Romo" that ERISA did not govern. (Docket Entry No. 12, at 6–7; *id.*, at 11 ("This is a cause of action to recover based on a promise distinct and independent of the Plan and does not implicate ERISA")). Without an ERISA claim, Romo argued, the court lacks subject matter jurisdiction. (*Id.*).

Romo also argued that the court lacks subject matter jurisdiction because a plan fiduciary cannot recover money damages from an employee under 29 U.S.C. § 1132(a)(3). (*Id.*, at 16). "Claims by plans or their fiduciaries to recover payments made to participants are inhibited by the strictures of ERISA's civil enforcement scheme." (*Id.*, at 18). Romo asserted that the "inapplicability of ERISA" to a fiduciary's claim for money damages also means that the court "lacks subject matter jurisdiction and venue is improper." (*Id.*).

Romo further argued that dismissal is appropriate under Rule 12(b)(1) because the Plan Administrator did not have standing to enforce what she asserted was a private agreement between JPMorgan Chase—not the Plan Administrator—and Romo. (*Id.*, at 20–21). "Parties that are not in privity to a contract lack standing to sue." (*Id.*, at 20).

3

Romo moved to dismiss under Rule 12(b)(6) for similar reasons. First, Romo asserted that the negotiated agreement on severance pay was a contract between JPMorgan Chase and Romo, and not the implementation of the ERISA Plan. (Docket No. 13, at 5, 10–16). Because "Plaintiff's purported claim does not arise under ERISA," Romo argued, the Plan Administrator did not state a claim upon which relief may be granted. (*Id.*, at 16). Second, even if ERISA did apply, Romo argued that the Plan Administrator's claim must fail because it "cannot recover monetary damages from Romo under § 1132(a)(3) as a matter of law." (*Id.*). Section 1132(a)(3) limits a plan beneficiary's "recovery to equitable relief." (*Id.*, at 18). "Monetary damages, such as the ones sought here, are not recoverable by a fiduciary under 29 U.S.C. § 1132(a)(3)." (*Id.*, at 18–19). Finally, Romo asserted that "nothing in the Plan . . . obligates Romo to return the consideration she received," because "[t]he Plan does [not] contain explicit[] requirements for repayment of severance pay," that are applicable here. (*Id.* at 19). Without language in the Severance Plan or the termination letter requiring Romo to return an overpayment, she argued, the Plan Administrator failed to plausibly allege a violation of "any provision of ERISA or the Plan." (*Id.*, at 20).

The Plan Administrator responded to Romo's motion to dismiss, arguing that "[t]he Complaint plausibly states a claim for relief as the Severance Plan establishes the proper severance benefit amount and ERISA authorizes plan beneficiaries, such as the Plan Administrator, to enforce the Plan terms and attain equitable relief to recoup improperly retained benefits." (Docket Entry No. 20, at 3). The Plan Administrator argued that dismissal under Rule 12(b)(1) is inappropriate because, under Fifth Circuit precedent, it is sufficient that a complaint seek relief under ERISA; "whether a party has a valid ERISA claim does not implicate subject matter jurisdiction." (*Id.*, at 7).

## II.     The Legal Standards

### A.     A Rule 12(b)(1) Motion to Dismiss

Under Rule 12(b)(1), "a claim is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (Miss. Plaintiffs)*, 668 F.3d 281, 286 (5th Cir. 2012) (quotation marks omitted). The plaintiff has the burden to establish subject matter jurisdiction. *Id.* "Courts may dismiss for lack of subject matter jurisdiction on any one of three different bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Clark v. Tarrant Cnty.*, 798 F.2d 736, 741 (5th Cir. 1986).

### B.     A Rule 12(b)(6) Motion to Dismiss

Under Rule 12(b)(6), a federal court dismisses a complaint if it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see also* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"). In reviewing a Rule 12(b)(6) motion, the court "accept[s] all well-pleaded facts as true and view[s] all facts in the light most favorable to the plaintiff." *Thompson v. City of Waco*, 764 F.3d 500, 502 (5th Cir. 2014). "A court reviewing a motion to dismiss under Rule 12(b)(6) may consider '(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201.'" *DZ Jewelry, LLC v. Certain Underwriters at Lloyds London*, No. H-20-3606, 2021 WL 1232778 (S.D. Tex. Mar. 12, 2021) (quoting *Inclusive Cmtys. Proj., Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019)).

"To survive dismissal, a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Thompson*, 764 F.3d at 503 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556); *see also Thompson*, 764 F.3d at 503 (when evaluating plausibility, the court does not "evaluate the plaintiff's likelihood of success" (internal quotation marks omitted)).

When a complaint fails to state a claim, the court should generally give the plaintiff a chance to amend before dismissing the action with prejudice, unless amendment would be futile. *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). Amendment is futile if an amended complaint would still fail to state a claim. *See Mandujano v. City of Pharr*, 786 F. App'x 434, 438 (5th Cir. 2019); *Bernegger v. Dep't of Revenue*, 785 F. App'x 209, 211 n.1 (5th Cir. 2019).

### III. Analysis

#### A. Subject Matter Jurisdiction

Romo argues that "ERISA is inapplicable to this dispute and Plaintiff fails to identify any separate federal question." (Docket Entry No. 12, at 5). This is an inappropriate basis for dismissal under Rule 12(b)(1). *See Smith v. Reg'l Transit Auth.*, 756 F.3d 340, 346–47 (5th Cir. 2014). The Plan Administrator "filed suit seeking relief under ERISA and argu[ed] that the [Severance] Plan in question is governed by ERISA." *Id.* at 345–46 (5th Cir. 2014). "[U]nless the Plaintiff['s] claim

6

is 'so insubstantial [or] implausible … as not to involve a federal controversy,' the Plaintiff['s] pleading triggers federal jurisdiction." *Id.* at 346 (quoting *ACS Recovery Servs., Inc. v. Griffin*, 723 F.3d 518, 523 (5th Cir. 2013)). The Plan Administrator asserts, as the fiduciary of the Severance Plan, that it provides severance payments to terminated employees in accordance with the Severance Plan's terms. (Docket Entry No. 6, at ¶¶ 1, 6). The complaint alleges that the Severance Pay Plan is "an employee pension plan governed by [ERISA]." (*Id.*, at ¶ 1). In notifying Romo that she was entitled to benefits under the Severance Plan, JPMorgan Chase "inadvertently used an incorrect eligible compensation rate for calculations of the severance pay amount and the incorrect number of weeks." (*Id.*, at ¶ 8). The Plan Administrator seeks relief under ERISA, 29 U.S.C. § 1132(a)(3), as a fiduciary of the Plan for the overpaid balance. (*Id.* ¶ 13). These allegations plausibly "involve a federal controversy."

For the same reason, dismissal under Rule 12(b)(1) is improper on Romo's argument that the Plan Administrator has not sought equitable relief as required under 29 U.S.C. § 1132(a)(3). "The Supreme Court has long held that 'the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case." *Griffin*, 723 F.3d at 522–23 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)).

Romo's argument that the Plan Administrator lacks standing is also without merit. "Standing requires: '(1) an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that a favorable decision will redress the injury.'" *Russell v. Harris Cnty.*, 500 F. Supp. 3d 577, 595 (S.D. Tex. 2020) (quoting *Croft v. Governor of Tex.*, 562 F.3d 735, 745 (5th Cir. 2009)). "[O]n a motion to dismiss, [the plaintiff] must allege facts that give rise to a plausible

7

claim of … standing." *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 133–34 (5th Cir. 2009).

The plaintiff has plausibly alleged that it has standing. The plaintiff is a plan fiduciary of a Severance Plan that allegedly lost $102,660.40 in improperly paid severance benefits. (Docket Entry No. 6, at ¶ 9). That injury was caused by its inadvertent error in calculating the number of weeks that Romo was eligible for severance payment. (*Id.*, at ¶ 8). Despite notification of the error, Romo has not remitted the overpayment. (*Id.*, at ¶ 12). The plaintiff seeks recovery of the overpaid severance benefits plus interest under 29 U.S.C. § 1132(a)(3). (*Id.*, at ¶ 19). Section 1132(a)(3) authorizes a civil action by a "fiduciary," like the Plan Administrator, "to obtain other appropriate equitable relief . . . to redress . . . violations [of the terms of the plan]." These facts give rise to a plausible claim of standing. The defendant's motion to dismiss under Rule 12(b)(1) is denied.

### B. Failure to State a Claim for Relief

Romo's primary argument under Rule 12(b)(6) is that she entered into a private, negotiated agreement with JPMorgan Chase for 42 weeks of severance pay, to be paid in one lump-sum payment, in exchange for releasing any legal claims against the company. Romo asserts that this agreement was separate from severance payments made under the company's Severance Plan. This argument disputes the allegations in the Plan Administrator's complaint and attached materials, which provide that the severance payments Romo received were from the Severance Plan, an ERISA plan.

Romo argues, in the alternative, that even if she received payment from an ERISA-governed plan, the Plan Administrator failed to state a plausible claim for relief under 29 U.S.C. § 1132(a)(3), because a plan fiduciary can seek only equitable relief. (Docket Entry No. 13, at 16).

8

Romo asserts that the Plan Administrator has not sought equitable relief because it seeks monetary damages. (*Id.*, at 18).

Based on the pleadings, the motion, response, and the applicable law, the court grants the motion to dismiss under Rule 12(b)(6) because the plaintiff has not sought "appropriate equitable relief" as required under § 1132(a)(3). The reasons are explained in detail below.

### i. Romo Received Payment from the Severance Plan

The pleadings and the record do not support Romo's argument that her severance payment was based on a negotiated agreement with JPMorgan Chase, and not the Severance Plan. Assuming that the facts sufficiently alleged in the complaint are true, the Plan Administrator sufficiently alleged that Romo "was a participant in the [Severance] Plan at all times relevant to this lawsuit"; that the Severance Plan "dictate[d] the weeks of severance pay available under the Plan, which corresponds with a participant's years of service"; and that the notice letter to Romo "inadvertently used an incorrect eligible compensation rate for calculations of the severance pay amount and the incorrect number of eligible weeks." (Docket Entry No. 6, at ¶¶ 5, 6, 8).

The August 2018 letter attached to the complaint supports the Plan Administrator's allegations that Romo's severance payment was made under JPMorgan Chase's Severance Plan and not under a separate contractual agreement with JPMorgan Chase. (*See* Docket Entry No. 7-1). The letter starts, "This notice letter . . . describes the severance pay and related benefits and services for which you will be eligible based on the terms of the JPMorgan Chase Severance Pay Plan (the 'Severance Plan')." (Docket Entry No. 7-1, at 2). The letter states that Romo was "eligible for a payment equal to 42 weeks of severance-eligible compensation . . . in accordance with the terms of the Severance Plan." (*Id.*, at 3). The letter continues: "If for any reason the number of weeks of severance pay described in this letter differs from the number of weeks that

9

you are eligible to receive under the Severance Plan, you will receive the number of weeks specified in the Severance Plan." (*Id.*, at 3). The letter repeatedly emphasizes that Romo's severance pay would be made according to the Severance Plan.

Romo argues that "[t]he lump-sum payment was <u>not</u> a general benefit provided by JPMC's Severance Pay Plan," but instead a "negotiated agreement" in exchange for Romo's release of "potential claims against the company." (Docket Entry No. 12, at 6 (emphasis in original)). In support, Romo cites to a single statement in the notice letter: 'The severance pay and benefits outlined in this letter (which are conditioned upon signing the release), exceed any pay and/or benefits you would be eligible to receive if you do not sign the Release." (Docket Entry No. 12, at 7 (quoting Docket Entry No. 7-1, at 3)). Romo argues that, by signing the Release, she was entitled to 42 weeks of severance pay, as stated in the August 2018 letter, even though this amount exceeded what she would otherwise be entitled to under the Severance Plan (34 weeks).

The August 2018 letter refutes this understanding. The letter and materials appended to it state that if Romo did not sign the Release, she would not be entitled to *any* severance benefits. Appended to the letter is a "Questions & Answers" section. That section provides that, "[t]he JPMorgan Chase Severance Pay Plan is discretionary as to whether severance is provided and is a welfare plan under [ERISA]. . . . If you are eligible and execute the Release Agreement, you will receive a single lump sum payment of your severance pay benefits through payroll following your Termination Date." (Docket Entry No. 7-1, at 14). Another document, named "Additional Information About Severance Pay Plan Benefits," states that "[e]ligible employees must decide whether, in exchange for the severance pay and other benefits detailed in the Plan, to accept the terms of the accompanying General release, which includes a waiver of claims against JPMorgan Chase & Co. and related parties." (*Id.*, at 17). The Severance Plan itself provides that "[n]o

10

payment [under the Severance Plan] will be made unless you sign and return the Release Agreement within 45 days." (Docket Entry No. 7, at 10).

The complaint and record reflect that by signing the Release, Romo was entitled to benefits according to the Severance Plan. The complaint alleges that, under the Severance Plan, Romo was eligible for 34 weeks of severance-eligible payment, but she incorrectly received 42 weeks. (Docket Entry No. 6, at ¶¶ 8–9). Romo confirmed in her motion to dismiss that she worked for JPMorgan Chase for 14 years. (Docket Entry No. 12, at 6). After 14 years of service, under the Severance Plan, Romo is only entitled to 34 weeks of severance. (Docket Entry No. 6, ¶ 6).

Romo's assertions that she entered into a separately negotiated contract, under which she was entitled to 42 weeks of payment, is, at best, a disputed material fact, and one without support in the present record. Dismissal is inappropriate on this ground.

## ii. The Severance Plan Is an ERISA Plan

The Plan Administrator has plausibly alleged that Romo was entitled to severance pay under the Severance Plan and that the Severance Plan is governed by ERISA. "Although retirement and health plans are perhaps the better known examples of ERISA plans, the statute contemplates that some severance plans will fall within its reach." *Gomez v. Ericsson, Inc.*, 828 F.3d 367, 371 (5th Cir. 2016). A Severance Plan is an ERISA plan when: "(1) the plan exists; (2) the plan falls within the safe-harbor provision established by the Department of Labor; and (3) the employer established or maintained the plan with the intent to benefit employees." *Peace v. Am. Gen. Life Ins. Co.*, 462 F.3d 437, 439 (5th Cir. 2006).

A plan exists if, "from the surrounding circumstances a reasonable person [could] ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 240 (5th Cir. 1990). The

"Summary Plan Description and Plan Document" and termination letter provided to terminated employees clearly outline each of these details. (*See* Docket Entry Nos. 7, 7-1).

A plan falls within the Department of Labor's safe harbor exclusion if it is a "group or group-type insurance program offered by an insurer to employees or members of an employee organization." 29 C.F.R. § 2510.3-1(j). The Severance Plan is not a "group-type insurance program offered by an insurer." A plan is a "group-type insurance program," if, among other factors, "[n]o contributions are made by an employer or employee organization," and "[t]he sole functions of the employer . . . with respect to the program are . . . to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs." *Id.* Here, the allegations are that the Severance Plan is "sponsored by the Company." (Docket Entry No. 7, at 7). The company "was responsible for its operation through the delegation of authority to [the] Plan Administrator." (Docket Entry No. 20, at 17 (citing Docket Entry No. 7, at 14)).

JPMorgan Chase "established or maintained the plan with the intent to benefit employees." *Peace*, 462 F.3d at 439. This "third step of [the] analysis" is broken into "two elements—(1) whether the employer established or maintained the plan, and (2) whether the employer intended to provide benefits to its employees." *Shearer v. Sw. Serv. Life Ins. Co.*, 516 F.3d 276, 279 (5th Cir. 2008). An employer "establish[es] or maintain[s]" a plan when it requires "an ongoing administrative program to meet the employer's obligation." *Washington v. Elec. Data Sys. Corp.*, No. 4:02-CV-303, 2003 WL 1233039, at *4 (E.D. Tex. (quoting *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 11 (1987)). The Severance Plan is alleged to be an ongoing administrative program. First, the Plan Administrator is "required to evaluate [the] employee's eligibility for severance benefits and, if eligible, the amount of those benefits." *Id.* at *4. The Plan had particular

eligibility requirements that must be assessed before distributing benefits. (Docket Entry No. 7, at 7; *see also id.*, at 14 (giving the Plan Administrator "full, sole and absolute discretion to interpret and administer the Plan, including, but not limited to determining whether an eligible termination has occurred . . . the amount of severance pay, and the form of the Release Agreement to be signed by participating employees.")). Second, the plan requires "ongoing administration" because JPMorgan Chase, "like any large corporation, regularly terminates employees." *Washington*, 2003 WL 1233039, at *4. Third, "the Severance Plan's appellate process . . . exhibits another administrative aspect of the plan." *Id.* "The Severance Plan includes an administrative claims procedure under the Department of Labor regulations." (Docket Entry No. 20, at 15 (citing Docket Entry No. 7, at 13)). The Plan gave terminated employees "60 days to appeal a claim for severance pay that is denied under the Plan," and the Plan Administrator 60 days to respond. (Docket Entry No. 7, at 13).

The second element, "intent to benefit employees," is met on the pleadings. The Severance Plan provides benefits for terminated employees who timely execute the Release Agreement. (Docket Entry No. 7, at 7); *see also Washington*, 2003 WL 1233039, at *4 ("[T]he Severance Plan was clearly intended to benefit employees by offering them benefits at the time of termination.").

The Severance Plan is an ERISA plan. Under ERISA, the Plan Administrator, as a fiduciary, may properly bring a claim under 29 U.S.C. § 1132(a)(3) for equitable relief.

### C.   Plaintiff Has Not Sought Equitable Relief

Although the Plan Administrator has alleged that Romo received payments from an ERISA-covered Severance Plan, dismissal without prejudice is necessary because the Plan Administrator has not sought "equitable relief" as required under § 1132(a)(3). The complaint states generally that the Plan Administrator "brings this action as a fiduciary . . . to (a) enjoin an

13

act of practice that violates ERISA or the terms of the Plan, and to (b) obtain other appropriate equitable relief to redress such violations." (Docket Entry No. 6, at ¶ 15). Specifically, the Plan Administrator asserts that it is "entitled to reimbursement from [Romo] for the balance of the Plan benefits that were overpaid under the Policy . . . plus interest," because Romo "would be unjustly enriched if allowed to retain the funds that were mistakenly paid by the Plan." (*Id.*, at ¶ 19).

"Congress, in drafting [§ 1132(a)(3)] to allow only 'equitable relief,' specifically contemplated the possibility of extending the plan fiduciaries a right to sue a participant for money damages and chose instead to limit fiduciaries' remedies to those typically available in equity." *Coop. Ben. Adm'rs, Inc. v. Ogden*, 367 F.3d 323, 332 (5th Cir. 2004). "[W]hether the remedy a plaintiff seeks 'is legal or equitable depends on [ (1) ] the basis for [the plaintiff's] claim and [ (2) ] the nature of the underlying remedies sought." *Montanile v. Bd. of Trustees of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 142 (2016) (alterations in original) (quoting *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 363 (2006)).

"Unjust enrichment . . . is a claim recognized at equity," but is "not a type of relief." *Aetna Life Ins. Co. v. DFW Sleep Diagnostics Ctr.*, No. 02-1335, 2004 WL 1543189, at *3 (E.D. La. July 8, 2004). The remedy for unjust enrichment is restitution, but not all restitution is equitable relief. *See Zirbel v. Ford Motor Co.*, 980 F.3d 520, 524 (6th Cir. 2020) ("§ 1332(a)(3)(B) authorizes 'restitution in equity,' not 'restitution at law.'") (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213–14 (2002)); *Cent. States, Se. & Sw. Areas Health & Welfare Fund ex rel. Bunte v. Health Special Risk, Inc.*, 756 F.3d 356, 362, 363 (5th Cir. 2014) ("[T]here are two types of restitution: legal restitution and equitable restitution. . . . [F]or money damages to be available under a theory of restitution, both the basis of the claim and the nature of the relief must be equitable.").

14

The complaint seeks to hold Romo liable for a sum of money. The Plan Administrator asks for direct reimbursement from Romo "for the balance of the Plan benefits that were overpaid." (Docket Entry No. ¶ 19). Typically, a plaintiff seeks equitable relief when it "impose[s] a constructive trust and equitable lien to recover the alleged overpayment." *Chevron Corp. v. Barrett*, No. H-07-3257, 2008 WL 4791471, at *5 (S.D. Tex. Oct. 30, 2008); *Zirbel*, 980 F.3d at 524 ("A court awards equitable restitution when it imposes a lien on 'particular funds or property in the defendant's possession' but legal restitution when it holds the defendant liable for a sum of money."). The Supreme Court has identified two types of equitable liens—an "equitable lien by agreement" and an "equitable lien . . . as a matter of restitution." *Sereboff*, 547 U.S. at 364–65 (quotation marks omitted). The Plan Administrator does not seek either as a form of relief.

The complaint does not allege an "equitable lien by agreement," because the complaint does not "point to any particular language used in its plan documents" that "explicitly or by implication, created an equitable lien over its alleged overpayment[]" to Romo. *Cigna Healthcare of Texas, Inc. v. VCare Health Servs., PLLC*, No. 3:20-CV-0077-D, 2020 WL 3545160, at *4–5 (N.D. Tex. June 29, 2020). In *Zirbel*, 980 F.3d at 520, the Sixth Circuit held that the plaintiff had pleaded a claim for relief in equity, because "[t]he plan's reimbursement provision gave it a right to recover a particular fund: the overpayment. As soon as [the defendant] received the overpayment, a lien attached, permitting the plan to seek equitable restitution in the amount of . . . $243,190." *See id.* at 523 (the plan states that, "In the event of an error that results in an overpayment of benefits to a Member . . . the amount of the overpayment shall be returned to the Retirement Fund, without limitation, except the Committee shall have discretionary authority to reduce any repayment amount from a Member."). Here, and unlike in *Zirbel*, the complaint does not identify any section of the Severance Plan that gives it a right to recover overpayments.

15

The Severance Plan does not appear to require a plan beneficiary to return overpayments. The Plan terms provide that Romo, as a fourteen-year employee, was entitled to only 34 weeks of severance. (Docket Entry No. 7, at 9). But the Plan does not explicitly require Romo to return any overpayment of severance pay. The Plan document includes a section named "Repayment of Severance Pay," but this section accounts for situations not present here. (*See id.*, at 10–11 ("In the event that you secure another position with the Company after your employment has terminated, you must repay the 'unused' portion of your severance prior to being re-employed.")). The Plan provides that "[e]ven if your severance pay has been paid, if the Company determines that you engaged in misconduct while you were employed by the Company, or if you solicit customers or employees of the Company during a period in which you are restricted from doing so, or if you violate the Company's Code of Conduct, you will be required to repay to the Company any severance pay that has been paid prior to the determination by the Company." (*Id.*, at 11). The complaint does not allege that Romo "engaged in misconduct," "solicit[ed] customers or employees," or "violate[d] the Company's Code of Conduct" to require remittance of severance benefits.

The Plan Administrator does not seek an equitable lien as a matter of restitution. An "equitable lien" provides "restitution in equity" when it "involve[s] enforcement of a 'constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff [can] clearly be traced to particular funds or property in the defendant's possession." *Montanile*, 577 U.S. at 142 (2016) (quoting *Knudson*, 534 U.S. at 213). The Plan Administrator does not allege that Romo is still "in possession of the funds in the amount overpaid by the [Severance] Plan," or that they can trace the funds to property in her possession, even though Romo received the severance benefits over three years ago. *Cigna Healthcare of Texas, Inc.*, 2020 WL

16

3545160, at *5 ("Cigna does not plausibly allege that the . . . alleged overpayments that it seeks can 'clearly be traced to funds or property in the defendant[s'] possession.'" (quoting *Knudson*, 534 U.S. at 213)); *see also Chevron Corp.*, 2008 WL 4791471, at *5 ("The amended complaint alleged that Barrett is in possession of the funds in the amount overpaid by the ChevronTexaco Plan."). This allegation is critical to seek an equitable lien as a matter of restitution. *See Cent. States, Se. & Sw. Areas Pension Fund v. Rodriguez*, No. 18-CV-7226, 2021 WL 131419, at *3 (N.D. Ill. Jan. 14, 2021) ("Even if plaintiffs are correct that they had an equitable lien on each mistaken deposit . . . as of the moment each mistaken deposit was made, dissipation of those funds would eliminate both the lien and the Fund's ability to enforce it via ERISA § 502(a)(3).").

The Plan Administrator claims that it has brought this suit to obtain equitable relief. But "[s]imply framing a claim as [seeking] equitable relief is insufficient to escape a determination that the relief sought is legal." *Cent. States, Se. & Sw. Areas Health & Welfare Fund ex rel. Bunte*, 756 F.3d at 361; *see also Int'l Painters & Allied Trades Indus. Pension Fund v. Aragones*, 643 F. Supp. 2d 1329, 1337–39 (M.D. Fla. 2008) ("To the extent that Plaintiffs, at present, seek only recovery of the amount of overpayment with interest, such recovery under 29 U.S.C. § 1132(a)(3) is . . . problematic given the restrictive construction the Supreme Court has given to that provision. . . . [T]o the extent that Plaintiffs seek merely an award for the benefits wrongfully made to the Defendant, the remedy appears legal in nature and unavailable under this subsection as restitution."). On the current pleadings, the court cannot conclude that the Plan Administrator seeks the type of relief required by 29 U.S.C. § 1132(a)(3) absent allegations that support a claim for equitable relief. The motion to dismiss is granted, with leave to amend.

**IV.     Conclusion**

Romo's motion to dismiss under Rule 12(b)(1), Docket Entry No. 12, is denied. The motion to dismiss under 12(b)(6), Docket Entry No. 13, is granted in part. JPMorgan Chase U.S. Severance Pay Plan Administrator's claims are dismissed, without prejudice and with leave to amend no later than **October 8, 2021**.

SIGNED on September 28, 2021, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge